Clarence Malloy and Ruth Malloy v. Commissioner.
Malloy v. Commissioner
Docket No. 1909-62.
United States Tax Court
T.C. Memo 1965-16; 1965 Tax Ct. Memo LEXIS 316; 24 T.C.M. (CCH) 69; T.C.M. (RIA) 65016; January 29, 1965
Theodore G. Gaines, for the petitioners. Donald J. Forman, for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $8,672.24 in income tax of the petitioners for 1958. The sole issue for decision is whether $26,258.39 received by Malloy in 1958 from R&R Insurance Service, Inc., was a long-term capital gain, as reported, or was ordinary income, as determined by the Commissioner. Findings of Fact The petitioners, husband and wife, filed their cash basis joint Federal income tax return for 1958 with the director of internal revenue for the district of Chicago. They lived in Downers Grove, Illinois. All stipulated facts are incorporated herein by this reference. The petitioners' return for 1958 *317 reported, inter alia, the following as long-term capital gain: Date
Date
Sales
Kind of property
acquired
sold
price
Cost
Gain
Sale of agency contract with
St. Louis Fire and Marine
Insurance Co.
May '56
Feb. '58
$26,258.39
none
$26,258.39
The Commissioner, in determining the deficiency, eliminated $13,129.20 from taxable long-term capital gain and included $28,000 in ordinary income from the transaction in issue. He now concedes that the correct amount received was $26,258.39 instead of $28,000. Malloy has been engaged as an agent in the "retrospective" automobile insurance business since 1946. He solicited business from insurance brokers, some of whom represented finance companies, automobile dealers or credit unions. The insurer was one of several insurance companies for which Malloy had authority to act as agent. The insurance covered fire, theft, collision and comprehensive, called physical damage, to an automobile. The broker would submit to Malloy an application setting forth, with respect to the applicant, his name, address, age, occupation, marital status, losses in last three years, any impairments; the make, year and body *318 style of the car; and any other information necessary in the issuance of a policy of car insurance. Malloy would then investigate, if necessary, decide with which of the several companies represented by him the insurance should be placed, depending in part upon how good or bad he deemed the risk and whether he deemed it acceptable, see that a policy was issued for the period requested and mail it to the broker with a bill for the premium less the broker's commission. The average commission was about 20 percent and was paid on both original and renewal insurance. Upon receipt of payment from the broker Malloy would pay the insurance company the full amount of the premium. Malloy took care of all changes in the policies which might become necessary. The broker would notify Malloy if the car was damaged or stolen. Malloy would investigate, have the insurer pay any amount due and he would make any recoveries possible. Malloy employed and paid a number of persons to assist him and to maintain necessary office records. Malloy entered into an agency agreement with the St. Louis Fire & Marine Insurance Company on April 15, 1955 under which the underwriting facilities of that company were *319 made available to Malloy. The agreement provided that the company would pay Malloy "as full compensation on business so placed with the Company, a commission computed" quarterly upon a stated formula. He was to receive the excess of 87 percent of earned premiums plus salvage and subrogation, over losses and loss expense paid or outstanding. A minus figure would be carried over to subsequent accountings, but the company could collect from Malloy monthly any money due it from him. The agreement could be terminated by either party upon written notice. Malloy, in some undisclosed way related to the above contract, was permitted to issue policies on one other of the four companies making up the St. Louis Insurance Group. The only sources of business income received by Malloy in his agency business was from insurers and was computed by a method similar to that described in the above contract. Malloy entered into negotiations late in 1957 with Bert A. Miller, president and principal stockholder of R&R Insurance Service, Inc., hereafter called R&R. R&R was a "retrospective" insurance agent, one of several competitors of Malloy in the Chicago area. R&R had an agency contract and insured *320 only, with companies in the St. Louis Insurance Group. Miller was well acquainted with Malloy's record as a "retrospective" insurance agent and with his contract and record with the St. Louis Fire & Marine Insurance Company. The oral negotiations resulted in a written agreement between Malloy and the St. Louis Group dated January 20, 1958 and a written agreement between Malloy and R&R dated January 24, 1958. The agreement dated January 20, 1958 was as follows: For valuable consideration receipt of which is hereby acknowledged I, Clarence E. Malloy, of Chicago, Illinois, do hereby assign, transfer and set over to the R & R Insurance Service, Inc. all of my right title and interest in all benefits and commissions earned after December 31, 1957 under the Agency Agreement of April 15, 1955 between Clarence E. Malloy and the Saint Louis Insurance Group, and in consideration of the acceptance of this assignment by the St. Louis Insurance Group, I hereby agree to pay forwith to the St. Louis Insurance Group any losses paid by them and occurring prior to December 31, 1957 in excess of the Reserve for unpaid losses as reflected on their records as of December 31, 1957 and to protect and *321 hold harmless for any return premiums due policyholders for cancellations prior to December 31, 1957. Signed: /s/ Clarence E. Malloy / Clarence E. Malloy Dated January 20, 1958 Accepted: St. Louis Insurance Group By: /s/ Wendell S. Henderson / Wendell S. Henderson, Vice-President The agreement dated January 24, 1958 provided as follows: In consideration of Clarence E. Malloy assigning his agency contract and all related rights and benefits in connection therewith, which he now has with the St. Louis Insurance Group to the R & R Insurance Service, Inc. of Chicago, Illinois, the undersigned R & R Insurance Service, Inc. agrees to pay to Clarence E. Malloy the sum of Twenty Eight Thousand ($28,000.00) Dollars. In further consideration of this assignment, Clarence E. Malloy does undertake and agree not to seek or accept a contract from the St. Louis Insurance Group or any of its related companies for a period of three (3) years from the date of this assignment. R & R INSURANCE SERVICE, INC. By: /s/ Bert A. Miller Bert A. Miller, President ACCEPTED: /s/ Clarence E. Malloy / Clarence E. Malloy Malloy and Miller had orally agreed that R&R would pay Malloy 30 percent *322 of the amount of unearned premiums which the St. Louis Insurance Group would show as of December 31, 1957 on its statement to Malloy for December 1957. That total amount later was found to be $87,527.98 and 30 percent of it was $26,258.39, the amount actually received by Malloy under his agreement with R&R. The transaction with R&R related to about one-third of Malloy's business. The percentage of premiums retained by one of the other companies represented by Malloy was 15 percent whereas St. Louis Fire & Marine Insurance Company retained only 13 percent. One reason why Malloy entered into the agreement with R&R was because his relations with St. Louis Fire & Marine Insurance Company had deteriorated somewhat in 1957. The record in this case does not show what policies were involved in the agreement with R&R, the amount of insurance involved in those policies, the periods covered by them or from what broker any one had come. The business had come from about 15 brokers. Malloy turned over to R&R a copy of the first sheet of each policy involved in their agreement and a list of the brokers through whom the business had been obtained showing the commissions received by each. He *323 later gave R&R a listing by policy number, inception date and the amount of unearned premium of each policy involved. Miller entered into the agreement with Malloy because he wanted to eliminate Malloy as the only remaining competitor of R&R representing the St. Louis Group in the Chicago area and because he thought R&R could realize a profit from commissions on the existing St. Louis Group policies which Malloy had obtained. He did not expect to renew and R&R did not renew any of those existing policies. R&R neither paid for nor received from Malloy any right to obtain new business or to renew any policy of insurance. Malloy continued his retrospective insurance business after 1957 as agent of companies not of the St. Louis Group. It does not appear that he discontinued his business with any broker after 1957 on account of the agreement with R&R. He reported for 1958 total receipts of $102,894.10 from that business. Opinion MURDOCK, Judge: The petitioners contend that the $26,258.39 received in 1958 from R&R represented a long-term capital gain. They reported the entire amount received as a long-term gain from the sale of Malloy's "agency contract with St. Louis Fire and Marine *324 Insurance Co." and they reported the date of acquisition of that contract as "May '56" and the date sold as "Feb. '58." That Agency Agreement was entered into on April 15, 1955, not in "May '56," and the transfer to R&R was as of the close of 1957, not "Feb. '58." Furthermore the Agency Agreement of April 15, 1955 with St. Louis Fire & Marine Insurance Company was not the property sold for the $26,258.39. No basis is claimed herein for whatever was sold. Section 1222(3) defines long-term capital gain as the gain from the sale of a capital asset held for more than 6 months. What capital asset, if any, which he had held for more than 6 months, did Malloy sell? The document dated January 24, 1958, executed by Miller as president of R&R and "accepted" by Malloy, states that the price is paid in consideration of "Malloy assigning his agency contract and all related rights and benefits in connection therewith, which he now has with the St. Louis Insurance Group to" R&R. The only written agency agreement which Malloy had with any company in the St. Louis Group was the one dated April 15, 1955 solely with the St. Louis Fire & Marine Insurance Company. He had no written agreement with the *325 St. Louis Insurance Group. There is testimony that after he entered into the Agency Agreement of April 15, 1955 with St. Louis Fire & Marine Insurance Company Malloy was able, in some undisclosed way, to have insurance issued by one other company in the St. Louis Group, but the record in this case does not show how he was to do that or how much of the insurance here involved was in the one company or in the other. The January 20, 1958 document between Malloy and the St. Louis Insurance Group was entered into to make sure that the St. Louis Insurance Group would have no objection to the transaction between Malloy and R&R and to bind Malloy to reimburse the St. Louis Insurance Group for any losses and return of premiums up to the close of 1957. Malloy stated in that document that he assigned to R&R all of his right title and interest in all benefits and commissions earned after December 31, 1957 under his agency agreement of April 15, 1955. The agreement of April 15, 1955, as already stated, was between Malloy and the St. Louis Fire & Marine Insurance Company only and the St. Louis Insurance Group was not a party to that agreement. The April 15, 1955 agreement was more than two years *326 old at the end of 1957 but the evidence here shows that it was not transferred to R&R and was not the property sold for the $26,258.39 here involved. There was no reason for R&R to have transferred to it Malloy's April 15, 1955 Agency Agreement with the St. Louis Fire & Marine Insurance Company. R&R already had a completely sufficient agency agreement with the St. Louis Insurance Group. It did not need and did not want to have Malloy's Agency Agreement with St. Louis Fire & Marine Insurance Company assigned or transferred to it. It did not want, pay for or obtain any right to solicit any renewal or new insurance policies under Malloy's Agency Agreement of April 15, 1955. The petitioners argue in part that Malloy sold good will to R&R. There is no showing that any part of the $26,258.39 was paid for good will. Miller's testimony indicates that he and R&R were not interested in obtaining and did not obtain any good will, any right to renew the policies involved herein or to obtain any future business from brokers as a result of the agreement with Malloy but, instead, R&R entered into that agreement for unrelated reasons. One of the brokers was already bankrupt. Malloy testified that *327 three of the brokers were to remain his customers and he was to service the policies of their clients if any service became necessary. However, there is no evidence that he renewed or serviced any of the policies involved herein. The transactions here involved in effect apparently terminated the April 15, 1955 agreement with the St. Louis Fire & Marine Insurance Company so far as Malloy was concerned. It did not transfer any good will from Malloy to R&R. R&R was interested in acquiring only the right which Malloy had to receive ultimately the amounts which would represent the excess of earned premiums over accrued net losses on the St. Louis Group policies still in force at the end of 1957. Those alone are what it paid the $26,258.39 for. Future business possibilities with particular brokers was not an asset owned by Malloy and no part of the $26,258.39 was paid for any such nonexistent benefit. R&R already knew the brokers involved, had done or had tried to do business with them and was not dealing with or paying Malloy for possible new business. R&R's relations with the brokers were not changed by the agreement with Malloy. R&R had an agency agreement under which it could do all *328 of the new business it could get involving new policies of the St. Louis Insurance Group. It was not interested in acquiring and it did not acquire or pay for Malloy's Agency Agreement with the St. Louis Fire & Marine Insurance Company. What it did pay for and acquire from Malloy were his rights and interests in such amounts as he might thereafter receive as his commission on St. Louis Group policies in force at the close of 1957 which Malloy had previously obtained for the insurers. Those benefits would require the performance of certain duties by R&R in case a necessity arose for changing some of those policies or for paying a loss thereon. All of the commissions later due would have been ordinary income to Malloy when received if he had not entered into the agreement with R&R and had done any more work which might have become necessary. The Commissioner contends that the $26,258.39 was received for an anticipatory assignment of the right to receive future ordinary income and was likewise ordinary income. It was not paid for an increase in value of a capital asset. Cf. . The question then is whether Malloy's rights and interests in benefits *329 and commissions which might be earned and become payable after December 31, 1957 on St. Louis Insurance Group policies theretofore obtained by him and still in force after December 31, 1957, were capital assets which he had held for more than 6 months. The record does not show what St. Louis Insurance Group policies obtained by Malloy were still in effect at the end of 1957, what company they were in, the unexpired terms of any such policies, the amount of insurance represented in any such policies, the date of issue of any such policies, the length of time that Malloy had held any right or interest in any such policies or the amount received by Malloy from R&R for his right or interest in any such policies which rights he had held for more than 6 months prior to the transfer or for his rights or interests in such policies which he had held for only 6 months or less. Some undisclosed part of the $26,258.39 might possibly have been received for rights which he had held for more than 6 months. The most important question for decision is whether the rights transferred were capital assets, regardless of how long Malloy had held them. They were not assets which were independently increasing *330 in value. Cf. . The fact that some services with respect to the outstanding policies might become necessary and might change the amount of Malloy's commission does not make his rights capital assets. Cf. , affd. ; . The petitioner has failed to show that what he sold and received the $26,258.39 for was a capital asset and what part of it, if any, he had held for more than 6 months. Decision will be entered under Rule 50.